IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 25, 2017 at Knoxville

**STATE OF TENNESSEE v. LEON DENTON and DEVAN DENTON**

**Appeal from the Criminal Court for Shelby County**
No. 12-02872       James M. Lammey, Judge

_____

**No. W2016-00910-CCA-R3-CD**

_____

After a jury trial, the defendants, Leon Denton and Devan Denton, were convicted of three counts of aggravated rape, one count of facilitation of aggravated rape, one count of facilitation of especially aggravated robbery, and two counts of facilitation of aggravated robbery. On appeal, the defendants assert the evidence was insufficient to support their convictions, arguing the State failed to overcome the defense of duress. The defendants also claim their right to a speedy trial was violated. Independently, Leon Denton argues his convictions violate double jeopardy. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Claiborne Ferguson, Memphis, Tennessee, for the appellant, Leon Denton.

Shannon M. Davis, Memphis, Tennessee, for the appellant, Devan Denton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Josh Corman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case involves five perpetrators and three victims. In the early morning hours of October 16, 2011, Leon Denton, Devan Denton, Antonio Howard, James Kerrigan,

and Brian Norwood committed several crimes against three female victims.[1]  As a result, the five men were jointly indicted on May 31, 2012 in Indictment No. 12-02872 for six counts of aggravated rape (Counts 1 through 6), one count of especially aggravated robbery (Count 7), two counts of aggravated robbery (Counts 8 and 9), and three counts of aggravated assault (Counts 10, 11, and 12).[2]

At the various requests of the five co-defendants, the trial date in this matter was reset multiple times over the next two years.  On February 5, 2014, the trial court set a final trial date for September 29, 2014.  At the February resetting, the State announced its intent to possibly sever some of the defendants prior to trial.  First, however, Antonio moved to sever his case from his co-defendants, and the State agreed.  The trial court granted severance, and Antonio was tried and convicted on September 29, 2014.  Subsequently, Leon filed a motion to dismiss claiming the trial court "improperly severed him out of the trial and thus violated his speedy trial rights and the case has now been tried to a jury, thus implicating double jeopardy/improper severance."  The trial court denied Leon's motion, and the present defendants were tried together on August 31, 2015.[3]

All three victims, K.W., L.G., and C.C., testified at the defendants' trial.[4]  The trial began with testimony from K.W. who explained that on October 15, 2011, L.G. and C.C. came to her apartment at the Mount Moriah Trails Apartments in Shelby County before going to a nightclub around 10:00 or 11:00 p.m.  While at the club, L.G. ordered one drink.  K.W. stated none of the women were intoxicated when they left the club around 2:00 or 3:00 a.m.  As the three friends left the club that night, L.G. asked a man in the parking lot for a cigarette lighter.  The man, whom the women later learned to be Antonio, gave L.G. a lighter and the two began talking.  The conversation led to the women agreeing to hang out with Antonio and James at K.W.'s apartment.  The men and the women drove towards K.W.'s apartment in separate cars.  Antonio motioned for the women to stop at a gas station.  When they stopped, the women realized five men in two separate cars were actually following them to the apartment.  These men included

---

[1]Because the defendants share the same last name, we will refer to each defendant and co-defendant by his first name.  No disrespect is intended.

[2]Counts 1, 4, 10, 11, and 12 were dismissed as to both defendants before trial.

[3]Prior to trial, Brian Norwood and James Kerrigan resolved their cases and agreed to testify for the State.

[4]It is the policy of this Court to refer to victims of sexual abuse by their initials.  However, for consistency, we have referred to all of the victims by their initials.

Antonio, James, Brian, and the defendants. The men bought beer and cigarillos at the gas station, and the group continued to K.W.'s apartment.

At the apartment, the three women, Antonio, and Brian sat at a table while James and the defendants sat in the living room. The group smoked marijuana and drank beer for approximately one hour. However, within a span of about twenty minutes, a gun fell from each of Antonio's and Brian's pockets, changing the mood of the evening. K.W. explained when Antonio's gun fell out of his pocket, she did not know what to do. Shortly thereafter, Brian's gun fell out of his pocket. As a result, K.W. asked everyone to leave because it was "getting late." Leon, Devan, Brian, and James moved towards the door, but Antonio asked to use the restroom. When Antonio came out of the restroom, he had his "gun drawn" and yelled, "This is a robbery." Antonio ordered the women to take off their clothes. K.W. initially thought he was joking, but upon the realization that he was not, told Antonio to take whatever he wanted. Antonio hit her in the face three times fracturing her eye socket. K.W. then lost consciousness.

L.G. testified that she realized Antonio was not joking when he ordered her, K.W., and C.C. to take off their clothes. Antonio grabbed her and "twirled [her] around" in front of the other men, asking if anyone liked what they saw. Antonio then pointed his gun at her and "made [her] perform oral sex [on Antonio] on the couch in front of them." L.G. was then forced into the bedroom with Antonio and Leon. She explained what happened in the bedroom as follows:

> [Antonio] led me to the room, and he had the gun. And he told me to get down and give him some head. And then [Antonio] got another guy in there with him to - so he could get some head. [Antonio] got behind me and started having sex with me; and then [Leon] got in front, and I had to give him oral sex. And the guy that I had to give oral sex to ejaculated in my mouth, and made me swallow.

L.G. testified that Antonio did not threaten Leon into engaging in oral sex with her and Antonio did not point his gun at him. Rather, L.G. stated Leon "made like he didn't want to, but he did it. I mean, he didn't pull back." Devan then entered the bedroom. Antonio said, "Oh man, get you some," and L.G. was forced to perform oral sex on Devan. She again explained Antonio did not threaten or force Devan into receiving oral sex from L.G., but rather, "there was no pull back. He did it."

C.C. testified that she turned her head while Antonio forced L.G. to give him oral sex on the couch. When Antonio and Leon took L.G. to the bedroom, C.C. was left in the living room with Devan, James, and Brian who was standing by the door. K.W. was unconscious on the floor. C.C. watched as Antonio and Leon walked to the bedroom.

- 3 -

C.C. testified that she did not hear Antonio threaten Leon, explaining their interaction "wasn't like anything forceful." She further stated, "[Leon's] decision was to go" into the bedroom.

After Leon, Antonio, and L.G. left the living room, C.C. noticed K.W. "start[] to come to." K.W. asked Brian for help, but he did not move. As a result, C.C helped K.W. onto the couch and got ice for K.W.'s eye which was swollen shut. C.C. realized that while she was in the kitchen getting ice, Devan left the living room. Antonio then reentered the living room and said, "Let's get all the stuff." Antonio ordered the women into the bathtub where they stayed for approximately ten minutes. When the women exited the bathroom, armed with brushes and hairspray, they saw the apartment door wide open and the men were gone. The women quickly dressed and drove to L.G.'s mother's home where the police and an ambulance were called.

Co-defendants, James and Brian, testified against the defendants at trial. James explained Antonio is his brother and Leon and Devan are his cousins. He stated he bumped into Antonio, Brian, Leon, and Devan on Beale Street the night of October 15, 2011. The men left Beale Street and went to a nightclub where they met the female victims in the club parking lot. According to James, the two groups agreed to go back to K.W.'s apartment "to hang out and have fun." After stopping at a gas station, the groups arrived at the apartment where they smoked marijuana and drank beer. James stated that both Antonio and Brian's guns fell out of their pockets, but the mood among the groups did not change until Antonio "upped his gun." Antonio then controlled the evening. Specifically, James testified Antonio came out of the bathroom with his gun raised, telling the women to get on the ground and get naked. When K.W. laughed, Antonio hit her and she fell to the ground. Antonio then made L.G. give him oral sex, while the men were "just standing on the wall." According to James, Antonio "asked all of [the men] did we like what we see. We told him, 'No,' that we didn't get down like that. That's when he said, more for him."

James saw Antonio and Leon go to the bedroom with L.G. He stated Antonio "put his arm around [Leon] and told him to come to the back with him" absent any threats or use of force. James heard "sexual moans" coming from the bedroom and realized Antonio was raping L.G. During the rape, Devan stated he was ready to leave and went to the bedroom to get Leon. As a result, "Antonio came out [of the bedroom] and told him we weren't going nowhere until he gets what he wants." James stated "[a]fter that, [Antonio] went back into the room and continued to rape the girl." Antonio came out of the bedroom again "telling [them] to get the TVs." As Antonio gave the order, Devan entered the bedroom. James soon entered the bedroom in order to take a TV and saw "[t]he girl performing oral sex on [Devan]." Only Devan and L.G. were in the bedroom at the time.

- 4 -

Antonio then told the women to get into the bathtub, threatening to kill K.W. if they did not comply. James testified that he stepped in between Antonio and K.W., telling Antonio he would not let him kill her, but Antonio pushed him out of the way. With the women in the bathtub, the men left the apartment with two TVs, a laptop, and three cell phones. After they left the apartment, James ended up with the three stolen cell phones. The police were able to track one of the phones, and James was arrested on October 17, 2011. James stated he was scared of Antonio and believed if he did not do what Antonio asked, someone would get hurt.

James also testified about a conversation he had with Leon days before trial. According to James, Leon asked him to change his testimony regarding how Leon ended up in the bedroom with Antonio and L.G. At Antonio's trial, James testified that the interaction between Antonio and Leon was "friendly" as they walked to the bedroom where Leon then received oral sex from L.G. However, Leon asked James to testify at his trial that "Antonio made [Leon] go to the back with him" rather than Leon went to the bedroom "freely." Ultimately, James testified, "It wasn't just friendly/friendly, though; but I wouldn't say he made him go to the back. But when he went to the back, I just seen him go to the back."

Brian also testified. He explained that as they arrived at K.W.'s apartment, Antonio told him, "[w]e don't know these girls, so you might want to bring your gun in with you." Brian complied and noticed Antonio also took a gun into the apartment. While they were hanging out, one of the women noticed Antonio's gun and Antonio showed it to her as a result. Brian later leaned back in his chair which caused his gun to fall out of his pocket. Brian realized the women were scared. Soon, "Antonio pulled his gun out and pointed it at the girl . . . that got hit in the eye, and pretty much told them - he said, 'You think I'm playin?'" Antonio then hit K.W. three times, knocking her unconscious. Antonio made the women take their clothes off, he twirled L.G. around and asked if the men would "like some of this." Antonio then forced L.G. to give him oral sex on the couch in front of everyone while he was holding a gun.

Brian described the interaction between Antonio and Leon as the two men walked to the bedroom with L.G. as follows:

> He got up, and he told the girl to go to the back room - to the backroom, and he told Leon - he told Leon - he pretty much asked us, "Y'all want some of this?" again. And everybody was like, "No." And he said, "Leon, you know, come on and get you some." He was like, "I'm [a]ll right." And then he had him on a choke like - "Quit acting like a

bitch," is what he told him - "You're acting like a bitch," or whatever, and they all walked back in the room.

Though Brian did not remember Antonio pointing his gun at Leon, he considered Antonio's language threatening. During cross-examination, Brian acknowledged that Antonio focused on Leon as he was forcing L.G. into the bedroom and "pretty much told him, 'Hey, bitch, come get you some head.'"

Brian stated Antonio was in control of the situation; however, nothing prevented him from walking out the door. Instead, Brian stated he "was literally frozen" during the criminal activity. When Antonio told him to take a TV and he refused, Antonio put a gun to K.W.'s head and threatened to shoot her. James intervened, and Antonio ordered the women into the bathtub. As the men left the apartment, Antonio took a laptop, Leon took a TV, and James took a TV and three cell phones. Brian stated as they drove away from the apartments, Antonio and Leon told him L.G. "said it was okay" for the men to have sex with her and "that Devan had got some oral sex, too." Brian and Devan turned themselves into police on October 18, 2011.

Lieutenant Celia Tisby of the Memphis Police Department was assigned to the case after the victims contacted police on October 16, 2011. Lieutenant Tisby took statements from the three victims and located the stolen cell phones which led to James's arrest. She also took DNA samples from Leon, Devan, and Antonio, the buccal swabs of which were entered into evidence at trial. Lieutenant Tisby read Devan's statement into the record at trial. In the statement, Devan explained his and Leon's involvement in the crimes against the three victims:

I was in shock when [Antonio] pulled the gun. I don't know if he flipped out or got a mental or what. The lady who was by the door, he told her to "Shut the fuck up," and he hit her in the face because she was talking. I think he hit her with his hand. He hit her one time, and she kept talking, and he hit her two more times. He says, "This bitch think I am playing and hit her one more time and knocked her out, and she just laid there."

He told me and everybody else to get the lady's flat-screen TVs, and me and my friend said, "No, we didn't want nothin' because we ain't part of this shit." He told us we were gonna make him shoot one of these bitches if we didn't grab a TV. We still didn't move. We were froze. He said - he said, "I got to get what I came for." He took the female who was red, about five/eight, and he took her and strut her around and said - he

- 6 -

said, "Do you all like this?" He took her to the couch, and he made her suck him up, and he asked anyone else if they wanted any, and we - no one said anything. And he said, "Okay. More for me."

He finished, and then he had the gun in his hand and grabbed my little brother [Leon]. He wrapped his right arm around my brother's neck and had the gun in his left hand and told him to come here so he can holler at him, and they went to the bedroom with the girl who had just sucked him off.

The lady that was knocked out, she was snoring, and her other friend was sitting there. When she came to consciousness, she was still kind of woozy, and Brian helped her sit down. She said she didn't want anything in here, "Just take everything." I [told] her, we didn't want anything to do with this shit. She said she just want her and her friends to be safe. That's what made me go in the backroom.

I walked in, and Antonio was raping this lady. It was from the rear. She was on the floor on all fours. I walked in there. I see he still have a gun, but it is in his right hand now. My brother was sitting on her bed, and she was sucking - performing oral sex on my brother. My uncle looked around and said, "Oh, you want some of this too." He jumped up out of her, and he got up out of her, and he told her to go over there and, "Suck my n**** up."

She stopped doing my brother, and he made her do me. She unzipped my pants and pulled out my penis, and she started giving me oral sex. My brother was buttoning up his pants. Antonio left the room, and I asked her if she really wanted to be doing this. She looked at me and said, "No." I told her to get up, and it didn't seem right to me as well. She stopped. As I was coming out of the room, my uncle had pulled the gun at this lady he had just knocked out, and I don't know - I don't, for sure, but I think my brother got in between her, and I heard him say, "I'm fixin' to shoot this bitch."

He told little brother Kendale to grab the flat screen; and my little brother said he was not doing it because he was not part of that. The lady said, "Just take it - take it" because she wanted him out of there. My brother, Leon, Kendale grabbed the flat screens. That's the only thing I saw taken. He made his little brother stuff one TV in my car, and my brother stuffed one in Brian's car.

- 7 -

Regarding his perception of L.G.'s consent, Devan stated: "She can't give consent if someone has her at gunpoint." Lieutenant Tisby testified that in Devan's statement, he did not indicate he was forced into participating in the criminal activity of October 16, 2011.

Margaret McCallum, a board certified sexual assault nurse examiner, performed a rape kit on L.G. on October 16, 2011 collecting oral, vaginal, and anal samples from the victim based upon the information L.G. provided regarding her assault. Donna Nelson, an expert in DNA testing and an agent with the Tennessee Bureau of Investigation, analyzed the rape kit with the buccal swabs of Leon, Devan, and Antonio. Agent Nelson's report, which was entered into evidence, indicated Leon's DNA profile matched L.G.'s rape kit.

At the close of the evidence, the jury returned guilty verdicts against each defendant for three counts of aggravated rape as charged in Counts 2, 3 and 6; one count of the lesser-included offense of facilitation of aggravated rape in Count 5; one count of the lesser-included offense of facilitation of especially aggravated robbery in Count 7; and two counts of the lesser-included offense of facilitation of aggravated robbery in Counts 8 and 9.[5] The trial court sentenced Devan, a Range I, standard offender, to an effective fifteen-year sentence. The trial court also sentenced Leon, a Range I, standard offender, to an effective fifteen-year sentence. This joint appeal followed.

## ANALYSIS

On appeal, the defendants challenge the sufficiency of the evidence for their convictions by way of arguing the State "failed to overcome the defense of duress." The defendants also allege they were "improperly severed" at trial which violated their right to a speedy trial. Independently, Leon asserts due to improper severance, his convictions violate double jeopardy. The State argues sufficient evidence exists to sustain the defendants' convictions, the defendants' right to a speedy trial was not violated, and double jeopardy did not attach to Leon's convictions. Upon our thorough review of the record, we agree with the State and affirm the judgments of the trial court.

I.    *Sufficiency of the Evidence*

---

[5]At the sentencing hearing, the trial court dismissed Leon Denton's convictions in Counts 8 and 9 noting they were incorrectly recorded on the verdict forms by the jury.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

In reviewing the defendants' duress argument, we apply the following statute:

> (a) Duress is a defense to prosecution where the person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

Tenn. Code Ann. § 39-11-504. "If admissible evidence supporting a duress defense is introduced, the State must negate the defense beyond a reasonable doubt before the defendant may be convicted." *State v. Green*, No. W2007-00570-CCA-R3-CD, 2008 WL 2115363, at *9 (Tenn. Crim. App. May 19, 2008) (citing Tenn. Code Ann. § 39-11-201(a)(3) (2003)).

As to Leon's involvement in the crimes, the record shows that he walked to the bedroom with Antonio moments after Antonio received oral sex from L.G. on the couch. According to L.G., C.C., and James, Leon went to the bedroom freely absent any threats or use of force from Antonio. Once in the bedroom, Antonio raped L.G. from behind while Leon received oral sex. L.G. stated Leon "didn't pull back," ejaculated in her mouth, and forced her to swallow. Furthermore, James testified that Leon tried to convince James to change his original testimony, in which James stated Leon went to the bedroom freely, to now indicate Leon was actually forced into the bedroom by Antonio. James, however, ultimately testified: "I wouldn't say [Antonio] made [Leon] go to the back."

Further, no testimony exists indicating Antonio pointed a gun at Leon during the rape or robbery of the victims. Though Devan's statement and Brian's testimony indicate Antonio used threatening language towards Leon as they walked to the bedroom, it is apparent the jury weighed both Devan's and Brian's statements against the vast amount of evidence produced against the defendant at trial, and found in favor of the State. This Court will not reweigh the factual and credibility determinations by the jury. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Regarding the robbery convictions, the three victims testified that the men took their cell phones along with K.W.'s laptop and two TVs. James and Brian both testified that Leon took a TV as they exited the apartment, absent any threats from Antonio. The record contains sufficient evidence supporting the jury's finding that the State met its burden of proof regarding Leon's defense of duress at trial.

Similarly, regarding Devan's involvement in the crimes, the record makes clear Devan walked to the bedroom on his own and received oral sex from L.G. while they were the only two in the room. No evidence exists to suggest Devan was forced or threatened into entering the bedroom by Antonio. L.G. testified "there was no pull back" from Devan in engaging in oral sex with her. Furthermore, Brian testified nothing prevented Devan from leaving the apartment during the criminal activity. Additionally, no evidence exists that Antonio pointed a gun, threatened, or used force against Devan during his participation in the rape and robberies of the three victims. Though the evidence indicates Antonio was in charge of the situation and James feared someone would get hurt if they did not do what Antonio wanted, it is clear the jury weighed this general premise against the evidence produced against the defendants at trial, and found

in favor of the State. Again, this Court will not reweigh the evidence. *Dorantes*, 331 S.W.3d at 379.

Furthermore, the record shows the trial court instructed the jury on the defense of duress stating "[i]f evidence is introduced supporting the defense of duress, the burden is on the state to prove beyond a reasonable doubt that the defendants did not act from duress" in order for the defendants to be found guilty. We presume the jury followed the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). And further, the jury's guilty verdicts demonstrate that it determined the State rebutted the duress defense beyond a reasonable doubt, and the record supports the jury's conclusion. The defendants are not entitled to relief as to this issue.

To the extent that the defendants challenge the sufficiency of the evidence, we conclude that their claim is without merit. The defendants were convicted of aggravated rape and the facilitation of aggravated rape, aggravated robbery, and especially aggravated robbery. As charged in the present indictment, an aggravated rape "is unlawful sexual penetration of a victim by the defendant" through force or coercion "and the defendant is armed with a weapon." Tenn. Code Ann. § 39-13-502. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501. A defendant is also guilty of aggravated rape when "[t]he defendant is aided or abetted by one (1) or more other persons" and "[f]orce or coercion is used to accomplish the act." *Id.*

Applicable to the remainder of the defendants' convictions, "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401. An aggravated robbery occurs when a robbery is "[a]ccomplished with a deadly weapon . . . or [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402. When "accomplished with a deadly weapon" or if "the victim suffers serious bodily injury," a robbery is elevated to especially aggravated robbery. Tenn. Code Ann. § 39-13-403. In the present indictment, the State alleged the defendants committed robbery "while acting in concert with two (2) or more other persons." Tenn. Code Ann. § 39-12-302(a). The proof at trial, viewed in the light most favorable to the State, showed that the defendants participated in the robbery of C.C., the robbery and assault of K.W. with the use of a gun, and the oral rape of L.G. absent any coercion or threats from Antonio.

- 11 -

Detailed in the record is the defendants' participation in the criminal activity initiated by Antonio on October 16, 2011. Not only did Leon and Devan both orally rape L.G., but the record shows they did so absent any force or coercion from Antonio. Leon received oral sex from L.G. while Antonio raped her. Leon ejaculated in her mouth and forced her to swallow. Devan then forced L.G. to perform oral sex in the bedroom while Antonio was in the living room. After raping L.G., the defendants joined their co-defendants in taking three cell phones, two TVs, and a laptop from the victims. Brian testified the defendants could have left the apartment, but did not. Though Antonio wielded a gun during the crimes, the evidence shows the gun was never turned on either defendant and Antonio's threats of violence were directed solely at the female victims. Accordingly, the evidence was sufficient to support the defendants' convictions for aggravated rape, and their convictions for the facilitation of aggravated rape, aggravated robbery, and especially aggravated robbery. The defendants are not entitled to relief.

## II.    *Severance, Speedy Trial, and Double Jeopardy*

The defendants argue the trial court improperly severed co-defendant Antonio over their objection which led to a violation of their right to a speedy trial. Further, Leon argues the improper severance also implicated his right against double jeopardy because Antonio was convicted prior to Leon under the same indictment. Upon our review, the record indicates these arguments are wholly without merit.

The record on appeal is absent any severance motions filed by the defendants or any of their co-defendants. Instead, the record shows Antonio made an oral motion to sever his case from his co-defendants on the day of trial. The State agreed, the trial court granted severance, and Antonio was convicted under Indictment No. 12-02872. Subsequently, Leon filed a motion to dismiss on December 2, 2014, citing improper severance from Antonio and a violation of his right to a speedy trial and against double jeopardy. Leon's motion was denied by the trial court on January 14, 2015. The record is absent any motions filed by Devan regarding improper severance or asserting his right to a speedy trial.

Upon our review of the transcript of the hearing on Leon's motion to dismiss, it is clear he tried to object to Antonio's severance motion at the September 29, 2014 trial setting but was denied by the trial court for lack of standing. This holds true on appeal. Neither Leon nor Devan moved to sever, and thus, they have no standing to now challenge Antonio's motion on appeal. Tenn. R. Crim. P. 14; *see State v. Lajuan Harbison*, No. E2015-00700-CCA-R3-CD, 2016 WL 4414723, at *15 (Tenn. Crim. App. Aug. 18, 2016), *appeal granted* (Dec. 14, 2016); *cf. State v. Cothran*, 115 S.W.3d 513, 520-21 (Tenn. Crim. App. 2003) (standing to bring a motion to suppress evidence

- 12 -

subsequent to a search stems from a defendant's legitimate expectation of privacy in the place or thing searched). Because the defendants have no standing to challenge Antonio's severance motion upon which they base their present arguments, these arguments must fail.

Regardless, we will briefly discuss the merits of the defendants' speedy trial argument. Criminal defendants are "entitled to a speedy trial" under both the United States and Tennessee Constitutions and Tennessee statutory authority. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Tenn. Code Ann. § 40-14-101; *State v. Utley*, 956 S.W.2d 489, 492 (Tenn. 1997). The trial court may dismiss an indictment if "unnecessary delay occurs in . . . bringing a defendant to trial." Tenn. R. Crim. P. 48(b)(2). To determine whether a speedy trial violation has occurred, the trial court must balance the factors outlined in *Barker v. Wingo*, which include: the length of delay, the reasons for delay, the defendant's assertion of the right to a speedy trial, and the prejudice resulting from the delay. 407 U.S. 514, 530-32 (1972); *see State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001) (adopting the *Barker* test in Tennessee). Dismissal is warranted if the trial court finds a defendant has been denied a speedy trial under the *Barker* analysis. *Barker*, 407 U.S. at 522. This Court reviews the trial court's determination regarding whether the defendant's right to a speedy trial was violated for an abuse of discretion. *State v. Hudgins*, 188 S.W.3d 663, 667 (Tenn. Crim. App. 2005) (citing *State v. Jefferson*, 938 S.W.2d 1, 14 (Tenn. Crim. App.1996)).

Here, a complete *Barker* analysis is not warranted primarily because the record shows the defendants failed to assert their right to a speedy trial at any time prior to trial. Accordingly, this issue has been waived. *See* Tenn. R. App. P. 36 ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Despite the defendants' waiver, the defendants cannot meet the *Barker* requirements.

Generally, we note, the defendants' trial began on August 31, 2015, which was well over one year after the date of their indictment on May 31, 2012. However, the record shows the reason for the delay of trial was due to the numerous requests of the defendants and co-defendants seeking to reset the trial as each attempted to investigate, prepare, or resolve their cases. The defendants' trial was not "delayed" by any action of the State. As such, no speedy trial violation exists. Additionally, the defendants assert a speedy trial violation emerged after the severance of co-defendant Antonio. Accordingly, their speedy trial complaint did not arise until September 29, 2014, when the State tried Antonio. The defendants were tried less than one year later on August 31, 2015, which does not trigger *Barker*.

- 13 -

As noted above, the record shows the defendants failed to assert their right to a speedy trial, again failing under *Barker*. Further, the defendants have failed to show prejudice resulting from the timing of their trial. Merely stating in their briefs that "memories had faded and witnesses became unavailable" is not sufficient. *State v. Harold Morris*, No. E2013-00803-CCA-MR3-CD, 2014 WL 12678224, at *7 (Tenn. Crim. App. May 6, 2014) ("A blanket statement that 'gives no indication as to the content and relevance of the lost testimony' is not sufficient to establish prejudice.") (citing *United States v. Harris*, 566 F.3d 422, 433 (5th Cir. 2009). Accordingly, the defendants are not entitled to any relief.

Out of an abundance of caution, we also note, "[t]he law on a motion for severance includes that '[t]he grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion.'" *Harbison*, 2016 WL 4414723, at *16 (internal citations omitted). The defendants have provided no evidence of any abuse of discretion by the trial court in granting Antonio's motion to sever. Absent abuse, our appellate review of this issue is again halted.

Regarding Leon's double jeopardy argument, he again is not entitled to relief. His argument stems from his assertion that Antonio was improperly severed from his case absent a hearing. Leon asserts that because the State proceeded to trial against Antonio after he was severed from the defendants, double jeopardy attached to the indictment under which Leon was also charged. This argument is contrary to logic. The right against double jeopardy ensures "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Our Supreme Court has stated, "[p]ractically all authorities agree that jeopardy begins when the accused is put upon trial before a court of competent jurisdiction, upon an indictment sufficient in form and substance to sustain a conviction, and the jury has been impaneled and sworn." *Etter v. State*, 205 S.W.2d 1, 3 (1947). It is abundantly clear in this case that Antonio properly severed his case from his co-defendants, and was tried and convicted for his criminal acts. Jeopardy did not attach to Leon's indictment after Antonio's trial, despite the two sharing Indictment No. 12-02872. Rather, less than one year later, Leon was tried and convicted for his participation in the crimes against K.W., L.G., and C.C. Again, Leon has no standing to challenge Antonio's severance motion from which his double jeopardy argument stems. Tenn. R. Crim. P. 14; *see Harbison*, 2016 WL 4414723, at *15; *cf. Cothran*, 115 S.W.3d at 520-21. This argument is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE